Council you may proceed. Thank you Judge Clifton and may it please the court. My name is Mark Caldwell. I'm here representing Mr. Aparicio in the Social Security Disability Appeal. As you indicated Judge Clifton I would like to try to reserve some time. I'm going to try to reserve five minutes for rebuttal if possible. This case concerns treating physician assessments that are familiar to at least two of the judges on the panel since we had an oral argument yesterday somewhat similar. And also the claimant credibility issue and those are the issues that I'm going to focus on during oral argument. Unlike yesterday I will not confuse a physician's assistant with a nurse practitioner. That was me who did that. I did too actually. But we are in fact dealing with a nurse practitioner today, Ms. Huschkel, and Dr. Kelly. And then of course we have the agency's own examining psychologist, Dr. Geary. The treating physician's assessments are contradicted by the assessment of a one-time consultative examiner, I hope I'm pronouncing it correctly, Dr. Yakub. And the ALJ gave, quote, substantial weight, end quote, to that physician's assessment. But the best case on that issue is Orn, O-R-N, 495F3-625, that talked about consultative examinations and said a consultative examination is not substantial evidence unless it relies upon independent findings. And that is almost a classic match for what we have here, because this doctor did not look at anything that was different from what the treating medical sources looked at. They both had the same MRI. They both had the positive straight leg raising test. They both had the same limited spinal range of motion. The only difference was that the treating medical sources who had more knowledge of this gentleman gave a different assessment from the one-time examining physician who saw him for one examination. Under the Orn case, therefore, the consultative examiner's opinion is not even substantial evidence. That would go even more so for the opinions of the non-examining state agency doctors who filled out assessment forms as part of the initial and reconsideration determinations. The ALJ stated that those were given some weight. I don't know what some weight means, but in any event, I don't think it makes too much difference, because I really think that he gave substantial weight to the one-time examiner. Now, the ALJ, in doing so, rejected the assessments of Dr. Kelly and the nurse practitioner, because he said, well, their assessments varied to some extent. And I will grant you that's true. They did vary to some extent. I don't think they varied, and I looked at them very, very carefully, I don't think that they varied to significant extents. At one point, sitting and standing was three hours. At another point, it was four hours. But the one thing that I think is very important is these, the three assessments that we have from these physicians, December 10, May 11, July 11, were absolutely consistent in three respects, two respects. One, every single time, they indicated that this person had to alternate sitting and standing every 30 minutes. And if you look at those treating physician assessments, excuse me, the treating physician treatment notes, they were talking about even during the examination, Mr. Aparicio was hunched over and leaning on the examining table. The other thing, and I think this is absolutely crucial, that was consistent in all three assessments was severe pain. And severe pain was the highest rating that could be given on the scale that was available on those assessment forms. Can I just interrupt you for a moment about the issue of the number of hours that the claimant was able to sit or stand. Yes, sir. And you said it, while the testimony varies, it doesn't vary enough to matter. And I'm wondering if that is actually correct. And the reason I ask you the question is the vocational examiner in his testimony said, the question was, at 481, the record, if the judge accepts the claimant's testimony as credible, would such an individual be able to sustain any work? And then in his answer, he says, no, and due to the amount of time that he spends lying down and being able to sit for three hours out of a day or stand for three hours out of a day, that's not acceptable in a competitive employment. So my question is, doesn't the vocational examiner's characterization of his ability to sit and stand and the lying down issue, and the record is kind of muddled on that point. So I'd like you to zero in on that. The record is not muddled in terms of the claimant's testimony, and that's what that particular question was based on, the claimant's testimony during the hearing about his symptoms. The variation that I am conceding, to some extent, is between the assessment forms from the treating medical sources, the three paper assessment forms, but that isn't the same as the question that you just pointed out to me, because that question was based upon the claimant's symptom testimony. And I'll switch a little bit to talk about the claimant's credibility, because I think that's important as you're bringing it up. The judge said, well, he had poor compliance with treatment, and to some extent, that's true. He didn't take good care of his diabetes. He had a high, what they call A1C, a glycosylated hemoglobin, which indicates poor blood sugar. He smoked. We all know he shouldn't be smoking with diabetes and a bad back. But this court addressed that issue in the Burns case, B-Y-R-N-E-S, and in the Bray case, B-R-A-Y, that said, you know, some people are just so addicted to nicotine that despite the fact that they shouldn't be doing it, they do it anyway, and that doesn't mean that they're not disabled. It means that they're not maybe having good judgment. It means that maybe they're engaging in behaviors they shouldn't behave in, but eligibility for disability benefits isn't a test of your willpower or your character. It's a matter of your medical condition. The judge also faulted the claimant because he hadn't had mental health treatment, yet the agency sent this gentleman to see the psychologist, and the psychologist gave some very significant findings that led to vocational expert testimony that it would be questionable whether that person would be able to sustain work. This court has addressed that. In Garrison, Brews, and Regeniter, all three cases say we are not necessarily going to confirm impairments for lack of treatment, because that can actually be a manifestation of the mental impairment. And then the ALJ in one of my Rule 28J letters, I addressed this with some specificity, engaged in a pretty selective evaluation of the evidence where he looked at the pain center records, and those records indicated at one point, ER 406, moderate control or stability of the patient. And as I point out in the Rule 28J letter, there are many instances in those same treatment records where it is noted there's instability, there's severe functional impairment, and the ALJ is not allowed to pick and choose among the evidence to reach a foregone conclusion, and that's the Garrison case and the Ganim case, G-H-A-N-I-M. He also said, well, there's no evidence of radiculopathy, because there was no elective electromyelography testing nerve conduction studies. The underlying fact is true, there were no such studies, but the physicians consistently diagnosed radiculopathy based upon their clinical findings, and there's no requirement that you have to have an EMG test. And then he went back to the Yacoub consultative examination, which I've already discussed as not being substantial evidence, and went to a one-time evaluation by Dr. Song, who looked at this gentleman to determine whether spinal surgery would be appropriate, and said, well, there's no effect on walking, running, sitting, standing, et cetera. If you look at that report carefully, that isn't what it says. It doesn't say there's no problem with it. It says aggravating and relieving factors, meaning this gentleman had unbearable pain, to use the exact words of the report, despite whatever activities he engaged in. It wasn't an indication that he could do all of those things. It was an indication that those things didn't have any effect one way or the other. So all of the reasons discussed for the ALJ's credibility determination fail, and I think that addresses your question. That, in and of itself, under the Lingenfelter case, would be sufficient for this Court to remand for payment of benefits, because in Lingenfelter it was exactly the same thing. The claimant's testimony alone, given the vocational expert's testimony, was sufficient for a finding of disability. But don't the — doesn't the claimant's testimony run a little bit inconsistent with some of the examining physician's testimony? The only examining physician we're talking about in the circumstances of this case would be the Yacoub Consultative Examination Report, and I addressed that in my opening remarks, that that, under the Orn case, should not be considered substantial evidence. I thought his own physician was a little not as precise as the claimant was in his testimony in terms of the amount of time sitting and standing. It was — I thought it was just a little bit unclear. I think you're right. I think you're right. I don't think those are exact matches. I don't think that invalidates his testimony. No, I'm not suggesting that, but I'm wondering if the ALJ can weigh both, right? And so even if we found that the claimant's own testimony was improperly discredited, doesn't the ALJ need to sort out the amount of time he can spend sitting, standing, lying down, and then match that up against the vocational examiner's testimony? Well, in this case, the vocational examiner's testimony did match up with what the claimant's symptom testimony was, and the conclusion of the vocational expert was that that person couldn't sustain work. I do want to try to reserve a little rebuttal, but let me finish with this one point. Regardless of some variations that we see in these assessments that we've been discussing, let's keep in mind that all of them would relegate the individual to less than sedentary work on the face of the assessed limitation. You're just not going to let me have that rebuttal, are you? I was trying to track Dr. Kelly, who at different times gave different opinions, and that's understandable. I'm not saying it's contradictory, but at least some of them seemed to add up to more hours than others. At least one, I thought, added up to at least as many as seven hours a day. And I don't think the vocational expert was asked about all the variations. So is it so clear that the vocational expert opined on all the reports given by the various physicians? I don't think the vocational expert has to in this sense. Under Ruling 96-8P, the commissioner has to assess the claimant's work capacities based upon the ability to sustain work activities on a regular and continuing basis, defined as eight hours a day, five days a week, or an equivalent work schedule. On the face of any of those assessments, regardless of vocational expert testimony, that person would not be capable of meeting that test. In the Beneke case, this court said, we don't have vocational expert testimony that completely matches the doctor's assessments, but it doesn't make any difference under these facts because given what those doctors had to say, that person would not be able to sustain work-related activities. And so I understand the point that you've made, but I still believe that even if you take all of those assessments, every single one of them, at face value, that would relegate the person to less than full-time work. But what is even more crucial, I know I said it before, is the complete consistency of severe pain, and the vocational expert's testimony that that limitation would preclude work-related activities. It almost makes the rest of what we've been talking about in terms of sitting, standing and walking almost superfluous because the heart of the matter is the fact that this man's condition had resulted in severe pain, such that he was consistently prescribed Percocet and Flexeril and Gabapentin throughout the treatment records and, of course, had these other various interventions of radiofrequency ablations and nerve blocks and epidural steroid injections that attest to the severity of his pain. Let me ask you a quick question on that. I know you're running out of time. That's okay. I gave up already. All the painkillers, there doesn't seem to be any discussion in the record as to what effect all those painkillers might have on his ability to sustain employment. Those are pretty heavy-duty painkillers. They are, and I could go to the record and flip through and find them, but I can tell you from recollection that there are indications in the record where he consistently reported that these aren't helping very much. There just wasn't much else they could do. That's why they resorted to the epidural steroid injections, the radiofrequency ablations, where they go in and burn the nerves, and to the nerve blocks where they go in and inject material right into the nerve area to try to anesthetize it. So if those medications had been efficacious, you wouldn't be seeing all these other interventions, which you did. While my opponent is talking, if you want me to flip through the record and find some citations to that, I'll try to do that, but I can assure you that there are multiple indications that he was not able to have relief from those medications. If the Court would like to give me some time for rebuttal, I'd appreciate it. But if not, thank you for your time. Thank you. We'll still give you a minute. Thank you, Judge. Somebody has something that needs to be turned off. Good morning, Your Honors. My name is Mike Thomas, and I represent the Commissioner in this case. May it please the Court. I'm going to focus my remarks, just as Mr. Caldwell did, on the ALJ's evaluation of Mr. Aparicio's credibility in this case, and also talk about whether the ALJ reasonably evaluated the medical source opinions in evaluating his residual functional capacity. And because the answer to this question, to these questions, is yes, the Court should affirm the ALJ's decision. By any standard in this case, Your Honors, the ALJ gave sufficient reasons for finding Mr. Aparicio's subjective complaints weren't credible. We talked about the objective medical evidence in this case, which was largely normal, and I point the Court to the findings of Dr. Yacoub, who found that Mr. Aparicio could walk normally. He could sit comfortably, take his shoes on and off, stand on his toes, hop, squat, and get on and off the examination table without discomfort. He had other normal findings, like normal coordination, full motor strength in his arms and legs, good muscle tone, bulk, and grip strength, and no muscle spasms or atrophy. And likewise, his treating physicians also found similar normal findings. Dr. Buckles found no gross motor or sensory deficits and only mildly decreased ranges of motion in his back. Also in evaluating Mr. Aparicio's credibility, the ALJ considered his activities of daily living, which were significant. The record showed that he participated in activities like caring for his personal needs, preparing simple meals, sometimes vacuuming for an hour at a time, which was directly at odds with his testimony at the hearing, that he could only stand or that standing for more than 30 minutes would be a challenge for him. He went outside on a daily basis. He drove and rode in cars. He dropped his son off at school, ran errands, worked in his yard, and did some housework. In this case, the ALJ also considered that Mr. Aparicio's back impairments responded to treatment. And in July of 2010, he told Dr. Buckles that his medications allowed him to remain somewhat functional and described his pain as quite tolerable. And that's at page 371 to 72 of the excerpts. And in February of 2011, he told Dr. Buckles that his condition was stable and his medications were crucial in allowing him to maintain his quality of life. And in May of 2011, Dr. Buckles noted moderate stability of his pain symptoms. And Mr. Caldwell spoke earlier about GANM and talked about how he argued that the ALJ cherry-picked insight into this evidence. And I don't believe that's the case. There are... Isn't the question whether the ALJ was appropriately discredited Dr. Kelly's testimony? So your question, Your Honor, is whether the ALJ you want me to move on to talking about Dr. Kelly? Well, I mean, I'd like you to address that. I just don't understand why the ALJ discredited Dr. Kelly's findings and favored Dr. Yacoub's. Okay. I'd be happy to talk about that. Well, for starters, under any standard, the ALJ considered and reasonably assigned only little weight to the opinions of Ms. Huschke and Dr. Kelly. They were not consistent with each other. There were pretty significant divergence in those opinions, and they did not explain their divergence. There were also unsupported limitations that they assessed. For example, they limited him to occasional use of his hands. But the record didn't really show that he had any limitations with respect to his hands. Instead, the record showed that he had normal hand function, such as good grip strength. And... Did the ALJ point to that? Yes. Where? Give me a moment here, Your Honor. I'm looking at ER 15, and I think that's the closest reference. Yes. All of the statements also opine that the claimant could only use his bilateral hands occasionally when there is no objective evidence that he would be so limited. The last sentence of the first full paragraph on 15 of the excerpts. And I think to address your question further, Judge Smith, you asked about why the ALJ could assign greater weight to the opinions of Dr. Yacoub. And Dr. Yacoub was a consultative examining physician. And she based her opinions on her own examination findings, which were largely normal. And I think it's also worth pointing out here that Dr. Yacoub's opinion was consistent with other evidence in the record, including the examination findings of Ms. Huschke. Mr. Aparicio's own nurse practitioner found that he had, consistently found that he had normal posture, sensation, motor functioning, coordination, balance, gait, stance, and reflexes. So under these circumstances, the ALJ didn't err in giving greater weight to the opinion of Dr. Yacoub than the opinions of Dr. Kelly and Ms. Huschke. It seems odd to me that the ALJ would say that Dr. Kelly's findings are inconsistent when the examinations occurred over a period of something like seven months. It seems very normal to me that a doctor's findings might be different at different times during a period of seven months, because conditions ebb and flow. It seems like the ALJ used that variation to discredit Dr. Kelly and then elevate Dr. Yacoub's findings over that. Well, while Mr. Aparicio argues that those inconsistencies are explained by the passage of time, the ALJ's interpretation is also reasonable. And this is because the opinions of Ms. Huschke and Dr. Kelly, you're right, they spanned only eight months, but there was very little variation in their examination findings. Well, did any of Dr. Kelly's findings suggest somebody who could work for eight hours a day five days a week, at least some of the reports, and I lose track of them after a while, indicated sitting and standing went out to something less than eight hours? Well, I would say the answer to your question is yes, Your Honor. There were his opinions, Dr. Kelly's opinions, but then we have Ms. Huschke, his physician assistant, who consistently found that he had normal posture, sensation, motor functioning, coordination, balance, gait, stance, and reflexes. So I think that the treatment notes do point to or suggest someone that could work eight hours a day five days a week. One of the things that Mr. Caldwell mentioned earlier with respect to the ALJ, with respect to the mental impairments in this case, one of the reasons the ALJ discounted Mr. Aparicio's credibility was because of his failure to seek treatment. And one of the ways in which he did not seek treatment was with respect to mental health. And the Ninth Circuit's case law does say that it's a questionable practice to chastise a claimant with a mental impairment for the exercise of poor judgment in seeking that treatment. And that's the Winn case, 100 F. 3rd, 1462. But here there wasn't any evidence that Mr. Aparicio's mental impairment was the cause of his failure to seek treatment. Dr. Geary diagnosed Mr. Aparicio with, among other things, a dysthymic disorder, and he also found that Mr. Aparicio had intact judgment and only mildly limited insight. Further, the evidence didn't show that any medical source, including Dr. Geary, ever said that Mr. Aparicio's failure to seek mental health treatment was related to any mental impairment. So as the Commissioner's, the Commissioner believes that the ALJ adequately and reasonably evaluated the credibility of Mr. Aparicio's subjective complaints and found that they were not credible. With respect to Dr. Geary, under any standard, the ALJ considered him reasonably assigned only little weight to his opinions. And here Dr. Geary assigned, admittedly, some moderate limitations, but those were inconsistent with his own narrative report, in which he found that Mr. Aparicio had a satisfactory attention span, an appropriate effect, only mildly impaired short-term recall, seemingly intact judgment, and only mildly limited insight. So the ALJ also reasonably evaluated and assigned little weight to the opinions of Dr. Geary. And one of the things that Mr. Caldwell has asked the Court to do as well is to reverse this case for payment of benefits. And I don't think that that's so. This is a case where you've got a split record, you've got inconsistencies in the record, but it was ALJ's job to consider the entire record, weigh the opinions, weigh the evidence, and come to a decision. The recent case law on this in the Ninth Circuit requires that the Court consider whether there's serious doubt about whether or not a person is disabled in deciding whether or not to reverse a case for payment of benefits. Could I just interrupt you for a moment? If we were to conclude that the ALJ improperly discredited the claimant's own testimony and we found that that testimony was credible, the vocational examiner's testimony, clearly it's based on the claimant's testimony, and that finding seems unequivocal that the claimant cannot sustain employment. So if we were to conclude that, doesn't it set itself up for a finding that he is not able to sustain employment and, therefore, remand for benefits would be appropriate? Well, it would set it up for that, Your Honor. But, again, the ALJ reasonably evaluated the claimant's credibility and found that the claimant's testimony was credible. So what else could the ALJ do? How could the record be further developed is what I'm asking you. Well, I would say that there are unresolved issues all over the place in this case. You've got the opinions of Dr. Kelly and Ms. Huschke, which conflict with Dr. Yacoub. They're not consistent with each other and they contain unsupported limitations. You have the findings and opinions of Dr. Geary, which conflict with his own examination findings, and he assigned moderate limitations, which weren't really an RFC assessment. Those are severity ratings found in the summary conclusions section of an MRFC form. You have the report of Dr. Yacoub who found largely normal findings and rendered an opinion that he did not require any assistive devices and can basically perform seated light work. And then you have Mr. Aparicio's own subjective reports of his activities, which included, again, caring for his needs, making meals, vacuuming, driving, dropping his son off at school, running errands and working in his yard and doing yard work. And so for all of these reasons, if the court cannot affirm the ALJ's decision, the proper remedy would be remand for further proceedings and not an award of benefits. Does the court have any additional questions? Thank you, Your Honors. I appreciate the opportunity to be here this morning. I'll try to make the most of my one minute. I have two factual statements to make. One, I believe the commissioner has made my case for me by pointing out that the consultative examiner and the treating medical sources had the same findings. That's exactly what the Orn case says. When you have the same findings but different conclusions, the consultative examination reported in substantial evidence. In terms of upper extremity impairments with no neuropathy, please go to ER 460. ALJ, are you having any residual effects from the diabetes? Are you having any neuropathy? Are your hands and feet getting numb? This is the ALJ talking. Yes, they're tingling right now. So if the ALJ mentions neuropathy, I don't think he can very much discount the testimony based on that. I want to end by saying this, this is not a case dealing with weighing of the evidence as the commissioner describes it. It's a case dealing with position assessments under the regulation at 404.1527. And I thank you for the extra ten seconds. Thank you. We thank both counsel for your arguments. The case just argued is submitted.
judges: Clifton, Owens, Smith